**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | |
|---|---|
| **CANON GARTH LIMITED**, <br><br> Plaintiff, <br><br> v. <br><br> **BANNER GRAIN & PEANUT COMPANY**, <br><br> Defendant. | Civil Action No. 7:14-CV-191 (HL) |

**ORDER**

This case is before the Court on Plaintiff's Partial Motion for Summary Judgment (Doc. 36) and Defendant's Partial Motion for Summary Judgment (Doc. 35). For the following reasons, Plaintiff's Partial Motion for Summary Judgment is granted-in-part and denied-in-part and Defendant's Partial Motion for Summary Judgment is granted-in-part and denied-in-part.

**I.    FACTUAL BACKGROUND**

Canon Garth ("Plaintiff") is a foreign corporation that produces, markets, and distributes select commodities, including peanuts, worldwide. (Doc. 35-6, ¶ 1; Doc. 36-1, ¶ 1). Banner Grain ("Defendant") is a corporation based in Georgia that specializes in buying and selling peanuts and other agricultural products. (Doc. 35-6, ¶ 2; Doc. 36-1, ¶ 2). Defendant also stores agricultural products, such as peanuts, at its facility in Tifton, Georgia. (See Doc. 40-4, ¶ 3).

In August of 2013, Defendant was storing a quantity of peanuts owned by the United States government through the Commodity Credit Corporation ("CCC")[1].  (Doc. 40-4, ¶ 3).  Defendant had the option to purchase these peanuts out of the CCC through two transactions—one to take place in August of 2013 and one to take place in September of 2013.  (Doc. 40-4, ¶ 3).  In order to purchase the peanuts out of the CCC, Defendant needed to borrow money from a third party.  (Doc. 40-4, ¶ 7).  Kenny Brownlee, President of Defendant, began negotiating with Tom Snoek, the group managing director for Plaintiff's holding company.  (Doc. 35-1, ¶ 28; Doc. 35-2, p. 10).  The parties formulated a transaction whereby Plaintiff would provide financing for Defendant to purchase a sum of peanuts out of the CCC.  (Doc. 35-6, ¶¶ 3, 4; Doc. 36-1, ¶¶ 3, 7).  The negotiations are memorialized in a series of letters and emails, relevant portions of which are included and discussed in the "Analysis" portion of this Order.

The negotiations culminated in the construction of two documents, both of which were drafted by Plaintiff's former counsel.  (Doc. 39-1, ¶ 5).  One document, Purchase Contract No. 2364 ("Purchase Contract") sets out the terms pursuant to which Plaintiff agreed to purchase 11,468 tons of peanuts from

---

[1] The CCC is a federal government corporation that operates to stabilize and protect farm income and prices.  It offers marketing assistance loans to provide interim financing to peanut producers so that the commodities can be stored after harvest.  If the loan is not paid back within nine months, the peanuts are forfeited to the United States government.  Commodity Credit Corporation Fact Sheet, UNITED STATES DEPARTMENT OF AGRICULTURE FARM SERVICE AGENCY, https://www.fsa.usda.gov/about-fsa/structure-and-organization/commodity-credit-corporation/index (last visited Sept. 26, 2016).

Defendant.   (Doc. 1-1).   The second document, Sales Contract No. 12043 ("Sales Contract"), sets out the terms by which Plaintiff agreed to sell the 11,468 tons of peanuts back to Defendant via a sliding scale payment structure.  (Doc. 1-3).   Collectively, the Court will refer to these two documents as "the Agreement."   Both documents are dated August 20, 2013 and were signed by Tom Snoek and Kenny Brownlee.   (Docs. 1-1, 1-3).   Although the Purchase Contract and Sales Contract reflect a transaction whereby Plaintiff purchased peanuts from Defendant that it then agreed to sell back to Defendant pursuant to a payment scale, both parties have referred to the Agreement as a "loan" at times.   (Doc. 39-1, ¶ 6).   Defendant contends that both parties viewed the transaction as a loan (Doc. 35-6, ¶ 6), and that the Purchase Contract and Sales Contract were only drafted to placate the lawyers (Doc. 40, p. 15).   Defendant believed the Agreement was non-binding and would be seen by no one.  (Doc. 35-1, ¶ 5).   Although Plaintiff appears to have understood the transaction to be a loan, in the sense that it believed Defendant would repurchase the peanuts and that Plaintiff would fully recover the money it paid under the Purchase Contract, Plaintiff believed that it held title to the peanuts until they were repurchased pursuant to the sliding scale payment plan.  (Doc. 40-4, ¶¶ 11–12).

A third document, a letter dated August 22, 2013, regarding "Security Interest in Assets of Canon Garth Limited" ("Security Agreement"), memorializes some additional alleged terms of the transaction between the parties.   The Security Agreement was written and signed by Tom Snoek and was mailed to

Banner Grain & Peanut Company.  (Doc. 1-4).  Relevant portions of the Security Agreement are excerpted in the Analysis portion below.

Pursuant to the Agreement, Plaintiff wired an amount exceeding $4.5 million to Defendant during August and September of 2013.[2]  (Doc. 35-6, ¶ 4; Doc. 39-1, ¶ 4).  Plaintiff borrowed this money from the British Arab Commercial Bank ("BACB").  (Doc. 36-1, ¶¶ 40, 42).  Defendant used the money to purchase a total of 11,468 tons of farmers' stock peanuts out of the CCC.  (Doc. 36-1, ¶ 11).  Because the purchased peanuts were already stored at Defendant's facilities, and because the Agreement did not call for transfer of possession of the peanuts from Defendant to Plaintiff, the peanuts remained in storage at Defendant's facility.  (Doc. 39-1, ¶ 35).  Defendant was supposed to make payments to Plaintiff pursuant to the sliding scale pay structure set out in the Sales Contract.  (Doc. 40-4, ¶ 12).

In order to pay Plaintiff, Defendant initially planned to convert at least some of the peanuts from in-hull to shelled goods and offer them for sale.[3]  (Doc. 40-4, ¶ 16).  However, "due to the declining market [for peanuts] after August 2013,

---

[2] Plaintiff contends that it wired $4,596,291.04 to Defendant in one document (Doc. 39-1, ¶ 4) and $4,594,669.42 in another document (Doc. 36-1, ¶ 11). Defendant contends that Plaintiff wired $4,594,902.18.  (Doc. 35-6, ¶ 4).

[3] Defendant appears to dispute Plaintiff's argument that Defendant intended to convert the peanuts from in-hull to shelled goods before selling.  (Doc. 40-4, ¶ 20).  However, Defendant does not dispute that it stated during contract negotiations that "once [Defendant] start[ed] converting from in-hull goods to shell goods [Defendant] [would] then offer the peanuts for sale."  (Doc. 40-4, ¶ 16).

unavailability of shellers, and government shutdown," Defendant was unable to find buyers for the peanuts as planned.  (Doc. 35-7, p. 2).  When Defendant failed to pay any of the money owed at the start of January 2014, Tom Snoek emailed Kenny Brownlee to request that Defendant "'re-purchase' a small quantity . . . to show . . . that [the peanuts are] 'starting to move.'"  (Doc. 36-3, p. 57).  Defendant began to seek an increased line of credit related to its peanut operations at this time.  (Doc. 35-6, ¶ 10).  Mr. Brownlee repeatedly reassured Mr. Snoek that payment would be arriving soon.  (Doc. 36-3, pp. 58–69).  Mr. Brownlee's reassurances and Mr. Snoek's demands are memorialized in a series of emails between the two.  Despite its repeated reassurance to Plaintiff that payment was imminent, Defendant was unable to obtain an increased line of credit to pay Plaintiff.  (Doc. 36-3, p. 69).  To this day, Defendant has not paid Plaintiff any money under the Agreement.  (Doc. 40-4, ¶ 56).

On May 9, 2014, Plaintiff requested that Defendant release the peanuts and demanded that Defendant "perform all tasks necessary to assist with storage, loading and transportation of the peanuts" in the process of transferring possession to Plaintiff.  (Doc. 40-4, ¶ 43).  The parties met on June 4, 2014 to discuss the best course of action for the transaction and agreed that Plaintiff would try to sell the farmers' stock peanuts to third parties.  (Doc. 35-6, ¶ 12; Doc. 39-1, ¶ 12).  Proceeds from any sales Plaintiff made would then be applied to the money Defendant owed Plaintiff.  (Doc. 39-1, ¶ 12).  In reliance on this

plan, Defendant released 9,205 tons of farmers' stock peanuts from its warehouse to Plaintiff.  (Doc. 40-4, ¶ 50).

On June 15, 2015, Plaintiff provided a transaction leger reflecting its sales to third parties.  (Doc. 35-2, p. 222).  The leger indicates that Plaintiff was able to sell a large portion of the peanuts and collected proceeds totaling $4,685,876.05.  (Doc. 35-2, p. 223; Doc. 35-2, p. 341).  Plaintiff valued the peanuts it was unable to sell at $556,791.65.  (Doc. 35-2, p. 223; Doc. 35-2, p. 341).  In selling the peanuts to third parties, Plaintiff incurred costs of $2,100,572.69, in large part because it converted the farmers' stock peanuts to shelled goods in order to make sales.  (Doc. 35-2, p. 341; Doc. 40-4, p. 21).  The parties disagree as to whether the decision to convert the peanuts to shelled goods was "commercially reasonable" under the circumstances.  (Doc. 40-4, ¶¶ 50–53).  As of the date of the leger, Plaintiff claims that it was owed $2,640,940.55 by Defendant.  (Doc. 35-2, p. 341).  This figure continues to rise as Defendant allegedly remains in breach of the Sales Contract.  (Doc. 40-4, ¶ 54).

Plaintiff has demanded on at least two occasions that Defendant release any peanuts belonging to Plaintiff that remain in Defendant's possession, or at the very least "cooperate in the prompt sale of the 11,468 tons of peanuts." (Doc. 36-2, pp. 75–80).  According to Plaintiff, Defendant has not only failed to make any payments pursuant to the Agreement but has also failed to release all of the 11,468 tons of peanuts allegedly owned by Plaintiff under the Purchase Contract.  (Doc. 36-1, ¶¶ 55–56).

Plaintiff filed its initial complaint (Doc.1) on December 2, 2014, which Plaintiff later amended (Doc. 4).   Defendant answered Plaintiff's amended complaint on January 29, 2015, asserting seventy-one defenses and nine counterclaims.   (Doc. 6).   At the conclusion of discovery, both Plaintiff and Defendant filed motions for summary judgment (Docs. 35, 36), which have been fully briefed and analyzed in detail below.   The Court held a hearing on the parties' motions for summary judgment on June 22, 2016 at the courthouse in Valdosta, Georgia.

## II.   SUMMARY JUDGMENT STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'" Info. Sys. & Networks Corp. v. City of Atlanta, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991).   The burden rests with the moving party to prove that no genuine issue of material fact exists.   Id.   The party may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

"If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment." New York Life Ins. Co. v. Grant, No. 5:14-CV-101, 2016 WL 1241186, at *6 (M.D. Ga. March 28, 2016) (slip copy) (citation omitted). The moving party must carry its burden by presenting "credible evidence" affirmatively showing that, "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." Four Parcels of Real Prop., 941 F.2d at 1438. In other words, the moving party's evidence must be so credible that, if not controverted at trial, the party would be entitled to a directed verdict." Id.

"If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" Id. (quoting Chanel, Inc. v. Italian Activewear of Fla., Inc., 931 F.2d 1472, 1477 (11th Cir. 1991)) (alteration in original). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Thus, the Court "'can only grant summary judgment if everything in the record demonstrates that no genuine issue of material fact exists.'" Strickland v.

Norfolk S. Ry. Co., 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting Tippens v. Celotex Corp., 805 F.2d 940, 952 (11th Cir. 1986)).

In contrast, "[w]hen the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim.'" Four Parcels of Real Prop., 941 F.2d at 1437 (quoting Celotex v. Cartrett, 477 U.S. 317, 323 (1986)) (emphasis in original). The moving party "simply may show . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 1438 (internal quotation marks and citation omitted). "Assuming the moving party has met its burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial." Info. Sys. & Networks Corp., 281 F.3d at 1224–25 (citing Celotex Corp., 477 U.S. at 324).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion. See Am. Bankers Ins. Grp. v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984) (internal quotation marks and citation omitted). The Court will consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. See Am. Bankers Ins. Grp., 408 F.3d at 1331.

### III.   ANALYSIS

### A.   Defendant's Motion for Summary Judgment

#### 1.   Plaintiff's Promissory Estoppel Claim (Count Three)

Count Three of Plaintiff's First Amended Complaint alleges that Defendant is liable for promissory estoppel based on promises Defendant made between August of 2013 and February of 2014 to pay Plaintiff money owed to it under the Sales Contract.   These alleged promises appear in emails written by Kenny Brownlee to Tom Snoek in the process of negotiating the terms of the Agreement and discussing Defendant's failure to make payment as the contract period neared expiration.

In Georgia, promissory estoppel "requires a showing that (1) the defendant made certain promises, (2) the defendant should have expected that the plaintiff[] would rely on such promises, and (3) the plaintiff[] did in fact rely on such promises to [its] detriment."   Adkins v. Cagle Foods JV, LLC, 411 F.3d 1320, 1326 (11th Cir. 2005) (citation omitted).   "Importantly, where a plaintiff seeks to enforce an underlying contract which is reduced to writing, promissory estoppel is not available as a remedy."   Id. (citing Bank of Dade v. Reeves, 354 S.E.2d 131 (1987)).

Defendant first argues that all of the promises which are the basis of Plaintiff's promissory estoppel claim concern "monies owed to [Plaintiff] under the Sales Contract," and therefore cannot serve as the basis for a promissory estoppel claim.   (Doc. 4, ¶ 36).   While it is true that "[t]here cannot be an express

and implied contract for the same thing existing at the same time between the same parties," and that "[a] plaintiff is estopped to recover on [promissory estoppel] where there exists an express agreement," it is not clear to the Court that the Agreement constitutes a contract.[4]  New York Life Ins. Co., 2016 WL 1241186, at *8.  Unless and until a jury has considered this case and determined that the Agreement between the Parties is a valid and enforceable contract, Plaintiff is entitled to pursue this alternative theory of recovery.

Defendant next argues that promissory estoppel is inapplicable to any promises which were made prior to August 20, 2013 because these statements "related to predictions of future events."  (Doc. 35-7, p. 11).  As indicated above, Plaintiff's promissory estoppel claim is based on statements made "[d]uring the negotiations in August of 2013 and up to and through February 2014."  (Doc. 4, ¶ 36).  In its response to Defendant's motion for summary judgment (Doc. 39), Plaintiff concedes that "the promises for which [Plaintiff] is suing under promissory estoppel occurred after the signing of the Sales Contract on August 20, 2013."  (Doc. 39, p. 2–3).  Thus, Defendant's argument as it pertains to promises made prior to August 20, 2013 is moot and the Court will not consider it.

As for promises made on or after August 20, 2013, Defendant argues that summary judgment is warranted in its favor because Plaintiff cannot establish

---

[4] See, *infra*, pp. 43–47, for a discussion of the existence of a contract.

detrimental reliance.  Promissory estoppel is an equitable doctrine and therefore requires "reasonable reliance on a promise, meaning that 'the plaintiff relied exclusively on such promise and not on his or her own preconceived intent or knowledge; that the plaintiff exercised due diligence, so as to justify such reliance as a matter of equity; and that there was nothing under the circumstances which would prevent the plaintiff from relying to his detriment.'" Reindel v. Mobile Content Network Company, LLC, 652 F.Supp. 2d 1278, 1290 (N.D. Ga. 2009) (citing Simpson Consulting, 490 S.E.2d 184).  "To establish detrimental reliance, a plaintiff must show that he changed his position to his detriment 'by surrendering, forgoing, or rendering a valuable right.'" Reindel v. Mobile Content Network Company, LLC, 652 F.Supp. 2d 1278, 1290 (N.D. Ga. 2009) (citing Clark v. Byrd, 564 S.E.2d 742 (Ga. Ct. App. 2002) ("Detrimental reliance which causes a substantial change in position will constitute sufficient consideration to support promissory estoppel.")).

Defendant's position is that Plaintiff cannot recover for promises made on or after August 20, 2013 because, at that point, Plaintiff "had allegedly entered into a contract to sale which completely eviscerates any ability to establish reasonable, exclusive reliance upon any statement made by [Defendant] after that date." (Doc. 35-7, pp. 11–12).  To the extent that the Agreement constitutes a contract, Plaintiff cannot establish detrimental reliance on promises made between August of 2013 and February of 2014, separate and apart from the contract's consideration.  However, if the jury finds that the Agreement is not a

contract, a reasonable jury could find that Plaintiff relied to its detriment in ways including, but not limited to, purchasing title to the peanuts under the Agreement or incurring interest on its loan from BACB.  Because material questions of fact remain as to whether the Agreement constituted a contract, Defendant is not entitled to summary judgment for lack of detrimental reliance on the part of Plaintiff.[5]

Defendant further argues that it is entitled to summary judgment because "Canon Garth elected to proceed under O.C.G.A. § 11-2-706 by 'resell[ing] the goods concerned or the undelivered balance thereof,'" and is therefore barred from pursuing the inconsistent remedy of promissory estoppel.  (Doc. 49, pp. 7–8).  In support of its contention, Defendant cites <u>Stokes v. Wright</u>,[6] <u>Rowe v. Weichselbaum Co.</u>,[7] and <u>Board of Education v. Day</u>.[8]  Importantly, each of these opinions was rendered prior to the enactment of the Georgia Civil Practice Act in 1966, which both Plaintiff and Defendant entirely ignore in their briefing.[9] Following the passage of the Act, Georgia courts clarified that, "a party may pursue inconsistent remedies," but is "not permitted a double recovery of the

---

[5] Defendant does not appear to challenge the reasonability of Plaintiff's reliance under the circumstances.  As a result, the Court declines to address this portion of the reasonable reliance test.

[6] 98 S.E. 27 (Ga. Ct. App. 1917).

[7] 60 S.E. 275 (Ga. Ct. App. 1908).

[8] 57 S.E. 359 (Ga. 1907).

[9] The Court recognizes that the Georgia Civil Practice Act is not binding on this Court; however, its passage effectively overruled the cases on which Defendant relies to support its argument that Plaintiff cannot pursue inconsistent remedies.

same damages for the same wrong." Marvin Nix Development Co. v. United Community Bank, 692 S.E.2d 23, 25 (Ga. Ct. App. 2010) (citations omitted). Here, because the Court declines to grant summary judgment in Plaintiff's favor on its breach of contract claim, Plaintiff can continue to pursue its promissory estoppel claim through the liability stage of this action. At that point, if the jury holds Defendant liable on multiple theories for the same harm, Defendant will only be entitled to one satisfaction of the same damages. See Marvin Nix Development Co., 692 S.E.2d at 25.

Defendant raises three other arguments in support of its motion for summary judgment on Plaintiff's promissory estoppel claim: (1) that Plaintiff failed to plead promissory estoppel in the alternative; (2) that Plaintiff has not admitted that the alleged sales contract between the parties is invalid; and (3) that Plaintiff has failed to show it suffered detrimental harm. The Court declines to grant summary judgment in Defendant's favor on the basis that Plaintiff did not explicitly plead promissory estoppel as an alternative theory of recover. Plaintiff did plead it as a separate count in the complaint. Further, because Plaintiff is entitled to pursue multiple inconsistent theories of recovery, Plaintiff need not admit that the contract between the parties is invalid in order to proceed with its promissory estoppel claim. Finally, the Court has concluded that a reasonable jury could find that Plaintiff relied to its detriment and suffered harm as a result.[10]

---

[10] See, supra, pp. 12–13.

Defendant's Motion for Summary Judgment is **DENIED** as to Plaintiff's claim for promissory estoppel.

### 2.    Plaintiff's Fraud Claim (Count Four)

Plaintiff's amended complaint alleges that Defendant is liable for fraud based on a series of emails which "misl[ed] Plaintiff to believ[e] Defendant intended to, or even could, honor its obligation [under the Agreement]." (Doc. 39, p. 8).  The emails upon which Plaintiff relies involve negotiations between Kenny Brownlee and Tom Snoek prior to the date the Agreement was signed.  (Doc. 36-6, pp. 46–50).  Plaintiff contends that Defendant knew, at the time Mr. Brownlee and Mr. Snoek were communicating about the terms of the Agreement, that it would be unable to pay Plaintiff.  Despite this, Mr. Brownlee made representations, including but not limited to his statement that Defendant would need no more than six months to repay the money paid by Plaintiff under the Agreement (Doc. 36-3, p. 50), which induced Plaintiff to sign the Agreement.

The tort of fraud consists of five elements: (1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages." Argentum Int'l, LLC v. Woods, 634 S.E.2d 195, 200 (Ga. Ct. App. 2006) (internal quotation marks omitted).  Whether a contract was fraudulently induced is generally a question for the jury.  Potomac Leasing Co. v. Thrasher, 354 S.E.2d 210, 213 (Ga. Ct. App. 1987).

Defendant first argues that it is entitled to summary judgment on Plaintiff's fraud claim because Plaintiff cannot sue for both breach of contract damages and fraud damages.   In support of its argument, Defendant cites Estate of Sam Farkas, Inc. v. Clark[11] for the proposition that "[a] party to a contract who believes that he has been tortiously or fraudulently induced into entering a contract has 'two options: (1) affirm the contract and sue [in contract] for breach; or (2) rescind the contract and sue in tort for fraud.'"   (Doc. 35-7, p. 15).   Defendant misrepresents the Georgia Court of Appeals' statement in Estate of Sam Farkas. It reads:

> In general, [*when there is a merger provision in the contract*], a party alleging fraudulent inducement to enter a contract has two options: (1) affirm the contract and sue [in contract] for breach; or (2) rescind the contract and sue in tort for fraud.

517 S.E.2d at 828 (brackets in original) (emphasis added) (citing Jones v. Cartee, 489 S.E.2d 141, 143 (Ga Ct. App. 1997)).   The presence of a merger clause eliminates the option to both affirm the contract and sue for fraud because a merger clause "operates as a disclaimer, establishing that the written contract completely and comprehensively represents all the parties' agreement.   This clause then bars the purchaser from asserting reliance on the alleged misrepresentation not contained within the contract."   Estate of Sam Farkas, 517 S.E.2d at 829 (citation omitted).    The Agreement in this case did not contain a merger clause.   Thus, the court's reasoning in Estate of Sam Farkas does not

---

[11] 517 S.E.2d 826 (Ga. Ct. App. 1999).

apply.  Further, it is not clear to the Court that the Agreement constituted a contract capable of being affirmed.[12]  Defendant is not entitled to summary judgment based on the court's holding in Estate of Sam Farkas.

Defendant next argues that Plaintiff has failed to show a genuine dispute regarding the element of justifiable reliance, and that it is entitled to summary judgment as a result.  "One of the essential elements of an action for fraud is justifiable reliance by the plaintiff."  Pampattiwar v. Hinson, 756 S.E.2d 246, 250 (Ga. Ct. App. 2014) (citations omitted).  "Blind reliance precludes a fraud claim as a matter of law."  Id. (citations omitted).  But, "[w]hile a party must exercise reasonable diligence to protect himself against the fraud of another, he is not bound to exhaust all means at his command to ascertain the truth before relying upon the representations.  Ordinarily the question whether the complaining party could have ascertained the falsity of the representations by proper diligence is for determination by the jury."  Id. (citations omitted).

Here, Defendant contends that Plaintiff blindly relied on the alleged representations by failing to either inquire into Defendant's financial status or ask for some form of financial documentation.  (Doc. 35-7, p. 19; Doc. 35-1, ¶ 25).  Plaintiff counters that it "made specific inquiries of Defendant to ascertain project structure and feasibility, visited [Defendant], and required [Defendant's] binding signature on the Sales Contract."  (Doc. 39, p. 10).  Plaintiff cites the following

---

[12] See, infra, pp. 43–47, for a discussion of the existence of a contract.

documents in support of this assertion: (1) an August 8, 2013 letter from Kenny Brownlee to Tom Snoek (Doc. 36-3, pp. 46–47); (2) an August 12, 2013 email exchange between Kenny Brownlee and Tom Snoek (Doc. 36-3, pp. 48–49); and (3) the Sales Contract (Doc. 1-3).

The August 8, 2013 letter was written by Kenny Brownlee and explains the total amount of money Defendant needed in order to buy the desired peanuts from the CCC.  Nothing in this letter supports Plaintiff's contention that it "made specific inquiries . . . to ascertain project structure and feasibility."  Rather, at best, the letter proves that the parties talked about the money Defendant needed in order to purchase peanuts out of the CCC in August and September of 2013.

The August 12, 2013 email evidences an exchange between Tom Snoek and Kenny Brownlee in which Mr. Snoek asks several questions about the transaction the parties were negotiating.  Viewing the facts in the light most favorable to Plaintiff, there are two questions which might be interpreted as an attempt at due diligence.  They are:

> Question: "Do you have debtor finance you can draw on once peanuts are delivered to your customer?"
>
> Answer: "Yes.  Banner will handle this."
>
> Question: "Can you give me the precise details of your Banner Grain and Peanut Company entity?"
>
> Answer: "Corporation.  Banner Grain & Peanut Company was formed January 31, 1983 in the State of Georgia USA.  Officers are Kenny Brownlee, President 100% owner and Jan J[.] Brownlee, Secretary-Treasurer."

(Doc. 36-3, p. 48).  While these questions had the potential to produce answers which might have satisfied Plaintiff's duty of due diligence, the answers did not disclose any information about Defendant's financial well-being, and Plaintiff apparently chose not to inquire further.  Thus, the August 12, 2013 email fails to establish that Plaintiff conducted the necessary due diligence.

Lastly, Plaintiff argues that it satisfied its due diligence requirement when it obtained Defendant's signature on the Sales Contract.  Plaintiff cites no authority for this statement, and it is contrary to the law.  See Jones v. Cartee et al., 489 S.E.2d 141, 143 (Ga. Ct. App. 1997) (holding that purchaser's reliance was not justified where both parties signed a $1.4 million contract for purchase of a golf course).  In Jones v. Cartee et al., the Georgia Court of Appeals was faced with a fraud claim involving a plaintiff who entered into a sales contract to purchase a golf course.  During the negotiations, the sellers of the golf course provided a two-page handwritten estimate of income and expenses of the golf course, prepared at the buyers' request.  Jones, 489 S.E.2d at 143.  The purchaser signed the $1.4 million contract without seeing anything more.  Id.  The estimate turned out to be inaccurate, and the purchaser sued for fraud.  Id.  The court found that the buyer's reliance was not justified because "[h]e failed to review business records or otherwise verify the accuracy of [the] estimate.  He merely accepted the figures provided by [the seller]."  Id. at 146.  The court held that, under these circumstances, the purchaser's blind reliance was unjustified.  Id.

Similar to the purchaser in <u>Jones</u>, Plaintiff's blind reliance was unjustified. Plaintiff made no attempt to obtain reliable financial information to ensure that Defendant would be able to make payments under the Agreement.  Instead, Plaintiff apparently trusted that Defendant would disclose, without being prompted, information about its allegedly poor financial health.  It was incumbent on Plaintiff to show that its reliance was justified, and Plaintiff failed to produce any evidence that it exercised reasonable diligence to protect itself against the alleged fraud of Defendant.  Accordingly, Defendant's Motion for Summary Judgment is **GRANTED** with respect to Plaintiff's claim for fraud.

### 3.    Plaintiff's Negligent Misrepresentation Claim (Count Six)

Defendant next moves for summary judgment on Plaintiff's negligent misrepresentation claim.  Plaintiff cites two pieces of evidence in support of its claim.  First, Plaintiff alleges that on August 15, 2013, Defendant negligently misrepresented its ability to perform its obligations under the Agreement.  (Doc. 4, ¶ 55).  Second, Plaintiff claims that, on February 27, 2014, Defendant negligently represented to Plaintiff that it was going to pay Plaintiff "as soon as possible" under the Agreement and that it would pay Plaintiff approximately $3.8 million before the end of March 2014.  (Doc. 4, ¶ 56).

In Georgia, the essential elements of a claim for negligent misrepresentation are "1) the defendant's negligent supply of false information to foreseeable persons, known or unknown, 2) such person's reasonable reliance upon that false information, and 3) economic injury proximately resulting from

20

such reliance." Home Depot U.S.A., Inc. v. Wabash Nat'l Corp., 724 S.E.2d 53, 60 (Ga. Ct. App. 2012). Defendant argues that even when viewing the evidence in the light most favorable to Plaintiff, there is no evidence to create a question of fact as to whether Plaintiff reasonably relied on either the August 15, 2013 email or the February 27, 2014 email. Accordingly, Defendant asserts that it is entitled to summary judgment.

Georgia courts have declared that the reasonable reliance required to state a negligent misrepresentation claim is equivalent to the justifiable reliance needed in the fraud context. Next Century Communications Corp. v. Ellis, 318 F.3d 1023, 1030 (11th Cir. 2003) (citing Paul v. Destito, 550 S.E.2d 739, 745 (Ga. Ct. App. 2001); Artzner v. A & A Exterminators, Inc., 531 S.E.2d 200, 205 (Ga. Ct. App. 2000)). The Court has already concluded that Defendant is entitled to summary judgment on Plaintiff's fraud claim because Plaintiff failed to adequately inquire into Defendant's financial health prior to entering into the Agreement, Plaintiff blindly relied on Defendant's statements that it would be able to pay Plaintiff, and the communications between the parties on both August 8, 2013 and August 12, 2013 fail to satisfy the reasonable diligence that Plaintiff had a duty to conduct.[13] The Court's reasoning as to the August 8, 2013 and August 12, 2013 communications cited in support of Plaintiff's fraud claim applies

---

[13] See, *supra*, pp. 15–20.

equally to the August 15, 2013 and February 27, 2014 communications that are

cited in support of Plaintiff's negligent misrepresentation claim.

Kenny Brownlee's August 15, 2013 email to Tom Snoek reads:

Tom,

I think the figure you are trying to work per ton is a good idea to
cover all cost, interest, and etc.  I would like to work it so much a ton
per month, because if I can make good sales, I can pay back
quicker.  However, if shelling is slow and sales get slow, I think we
need to go beyond December 31st.  If we figure 6 months from now,
I think that would be the maximum time frame.

Once we start converting from in-hull goods to shell goods we will
then offer the peanuts for sale.   Once sold, we can pay Canon
Garth.  If we can sell in the hull, we can pay Canon Garth at that
time immediately.  You will have a lien in effect whether the peanuts
are in the hull or shelled goods.

See if this will work with you.

Thanks,
Kenny

(Doc. 36-3, p. 50).  Although this email contains Mr. Brownlee's estimate that it

would take six months to pay Plaintiff back pursuant to the Agreement, it fails to

show how Plaintiff's alleged reliance on this statement was reasonable.  There is

no evidence that Plaintiff sought any sort of financial records or assurances of

financial well-being beyond Mr. Brownlee's assertion.  Further, Plaintiff does not

even dispute Defendant's argument that Plaintiff's reliance was unjustified in its

response to Defendant's motion for summary judgment.  Rather, Plaintiff relies

on irrelevant assertions, such as that Defendant "should have known" that it

would not be able to pay Plaintiff pursuant to the Agreement.  Plaintiff goes on to

say that Defendant "did not disclose at that time or any other time to Canon Garth its precarious financial position . . . ."  (Doc. 39, p. 12).  Justifiable reliance is not satisfied by merely accepting the statements of an interested party about whether that party will be able to make payment.  Plaintiff was required, at minimum, to attempt to verify the accuracy of Mr. Brownlee's remarks, through financial records or otherwise.

The same is true for the February 27, 2014 email that Plaintiff cites in support of its negligent misrepresentation claim.  In this email, Kenny Brownlee assures Tom Snoek that Defendant will "get [Plaintiff] paid as soon as possible" and sets out a specific plan pursuant to which Defendant would pay Plaintiff $4,300,000 prior to the end of March 2014.  (Doc. 36-3, p. 63).   At that point, the Agreement was one day short of its final deadline for payment, and Defendant had yet to pay any money to Plaintiff.  Despite numerous attempts by Tom Snoek on behalf of his banker to determine when payment would be made, Mr. Snoek never asked to review business records, to speak with Defendant's bank directly, or otherwise sought to verify the accuracy of Mr. Brownlee's repeated reassurances that payment was imminent.  Under these circumstances, any reliance on Mr. Brownlee's statements by Plaintiff was unjustified.  Defendant's Motion for Summary Judgment is accordingly **GRANTED** with respect to Plaintiff's claim for negligent misrepresentation.

### 4.    Defendant's Counterclaim for Tariff (Count One)

Defendant moves for summary judgment in its favor on its counterclaim for a tariff Plaintiff allegedly owes under the United States Warehouse Act ("Act"). The Act provides regulatory licensing for the storage of agricultural products in federally-licensed warehouses.  Warehouses licensed under the Act are required to abide by certain regulations that are determined by the Secretary of Agriculture.   See 7 U.S.C. §§ 241–56.   A warehouse desiring to charge customers for its services must furnish the Farm Service Agency within the Department of Agriculture with copies of its current schedule of charges and rates for all services.  7 C.F.R. § 735.404(a).  A warehouse that has a schedule of charges in place can demand that its customer pay the tariff prior to delivery of the stored agricultural products.  7 U.S.C. § 251(b); 7 C.F.R. § 735.110(b).  By the same token, a warehouse customer can demand delivery of the products to which it holds title, and the warehouse must promptly deliver the products.  7 U.S.C. § 251(a); 7 C.F.R. § 735.110(a).

On September 1, 2012, Defendant furnished its notice of fees and charges for the storage and handling of peanuts to the Farm Service Agency.  (Doc. 6-1, p.1).  The rates were as follows:

| | |
|---|---|
| Storage | $.089 per day |
| Fumigation | $.10 per day |
| In Charges & Associated Costs | $39.99 |
| Load Out Charges | $30.00 |

Shrinkage on Incoming Weight
    Runner and Spanish        3.5%
    Virginia                4%

(Doc. 6-1, p. 1).   The rates changed, effective September 1, 2013, to the following:

| | |
|---|---|
| Storage | $.089 per day |
| Fumigation | $.12 per day |
| In Charges & Associated Costs | $52.00 |
| Load Out Charges | $30.00 |
| Shrinkage on Incoming Weight<br>    Runner and Spanish<br>    Virginia | <br>3.5%<br>4% |

(Doc. 6-1, p. 2).  Because Plaintiff held title to the peanuts while Defendant maintained possession with the intention of paying off the "loan," Defendant argues that Plaintiff is liable to it for storage fees, fumigation and insurance charges, in charges, and load out charges.  Defendant claims that the amount owed equals $2,272,422.70.[14]  (Doc. 6, ¶ 66).

In response, Plaintiff argues that it is neither legally nor contractually bound to pay the tariff.  Plaintiff points out that any *requirement* that a user pay a tariff for storage and fumigation is notably absent from 7 C.F.R. § 735.404, which

---

[14] Defendant arrived at this amount by adding the following: (a) storage fees equal to $660,976.89; (b) fumigation and insurance charges equal to $820,308.38; (c) in charges equal to $447,266.43; and (d) load out charges equal to $344,051.10.

"provides only that an authorized provider must furnish the FSA with copies of its current schedule of charges and rate [*sic*], the rates charged must be in effect for a minimum period of one year, and that the FSA must be furnished advance notice of the provider's intent to change rates or charges."  (Doc. 39, p. 15). Plaintiff does not contest that Defendant had a schedule of charges or that it submitted these charges to the FSA.   Rather, it is Plaintiff's position that compliance with this section does not legally entitle a warehouse to recover these fees without taking additional steps to legally bind customers.  The Court agrees.   Compliance with the provision of the Warehouse Act that allows a warehouse to implement fees for storage and associated costs, without more, does not legally bind a warehouse's customers to pay the approved fees.

Plaintiff also argues that, even assuming that compliance with the reporting provisions legally binds customers to pay these fees, Defendant failed to comply with other portions of the regulations and therefore cannot recover the tariff. Specifically, Defendant failed to promptly deliver the peanuts to Plaintiff on its demand, in violation of 7 U.S.C. § 251(a) and 7 C.F.R. § 735.110(a).  Plaintiff also argues that Defendant failed to comply with 7 U.S.C. § 251(b) and 7 C.F.R. § 735.110(b), which provide that payment of the tariff must be made prior to delivery of the agricultural product if requested by the warehouse operator.

The Court finds Plaintiff's argument that Defendant's alleged failure to comply with the Act constitutes a waiver of its right to collect the tariff incorrect as a matter of law.  Nothing in the statute supports this position.  Further, the Court

observes that 7 U.S.C. § 251(b) and 7 C.F.R. § 735.110(b) do not require that a request for payment be made prior to delivery; rather, the provision requires that payment be made prior to delivery *if requested*.  Thus, Defendant's failure to request payment prior to delivering a portion of the peanuts to Plaintiff was not in violation of the Act, contrary to Plaintiff's argument.  In sum, the Court is not compelled by Plaintiff's position that Defendant's alleged non-compliance with the Act is fatal to its tariff claim.

In addition to the lack of legal authority for Defendant's tariff claim, Plaintiff argues that it is not bound to pay the tariff because Defendant failed to provide adequate notice that it planned to charge the tariff.  In Defendant's motion for summary judgment on this issue, it argues that Plaintiff is liable for the tariff because Plaintiff (1) "understood that [Defendant] was storing, fumigating, loaded out, and loaded in the farmer stock peanuts for [Plaintiff's] benefit," (2) agreed to "pay all fees an [*sic*] expenses related to [Defendant's] possession of the peanuts," and (3) was advised that Defendant operated under the Act  (Doc. 35-7, p. 29).

Plaintiff responds to each of these points independently.  First, Plaintiff concedes that it understood Defendant was storing the peanuts for its benefit, but contests Defendant's argument that this makes Plaintiff liable for the tariff.  Rather, Plaintiff claims that it believed Defendant was storing the peanuts for free.  (Doc. 35-2, p. 207).  And, if Defendant had disclosed that storing for Plaintiff's benefit entailed charging the tariff, the selling price charged by Plaintiff

would have been higher because the Sales Contract was intended to set out the costs "built into the difference between the buying and selling price." (Doc. 36-2, p. 52). With respect to Defendant's argument that Plaintiff agreed to pay the fees and expenses related to Defendant's possession of the peanuts, Plaintiff argues that this is a provision of the Security Agreement, not the Sales Contract or Purchase Contract. Without citation or explanation, Plaintiff states that the Security Agreement "applies to [Defendant's] breach of contract claim and not its claim for a tariff." (Doc. 39, p. 18). Finally, Plaintiff argues that there is no law to support Defendant's contention that as a matter of law, notice that a warehouse operates under the Act is sufficient notice to charge a tariff approved pursuant to the Act. (Doc. 39, p. 19).

The Court concludes that some form of notice is required if a warehouse operator intends to charge a warehouse user for storage, fumigation, load in, and load out fees, as Defendant attempts to do through its tariff claim. Authorization by the Secretary of Agriculture alone is not sufficient to bind a warehouse user to pay a tariff about which it is not informed. However, it is the role of the jury, not the judge, to determine whether the notice provided in this case—including but not limited to the posting of the schedule of fees in Defendant's warehouse, informing Plaintiff that Defendant was a warehouse licensed under the Act, and Plaintiff's agreement to pay "all fees and expenses" related to Defendant's storage under the Security Agreement—was sufficient to bind Plaintiff to pay the tariff. After a thorough examination of the record and analysis of the arguments

presented, and viewing the facts in the light most favorable to Plaintiff, the Court concludes that material questions of fact remain unanswered as to Defendant's tariff claim and Defendant's motion for summary judgment with respect to its counterclaim for the tariff is **DENIED**.

### B.   Plaintiff's Motion for Summary Judgment

#### 1.   Defendant's Counterclaim for Tariff (Count One)

Plaintiff moves for summary judgment in its favor on Defendant's counterclaim for the tariff.  Plaintiff reiterates the arguments it made in Response to Defendant's Motion for Summary Judgment on its counterclaim for the tariff.[15] Plaintiff also argues that the fees allowed by the Act do not apply to the Agreement because the at-issue peanuts were "flow through products for which [Defendant was] an agent for immediate shipment for sale to the ultimate consumer."  (Doc. 36-2, p. 16).  The Act, and fees promulgated pursuant to the Act, applies only to "stored" products and not "flow through" products.  In re Julien Co., 44 F.3d 426, 431 (6th Cir. 1995) (citation omitted).  The Act defines "stored agricultural products" as "all agricultural products received into, stored within, or delivered out of the warehouse that are not classified as a non-storage agricultural product under this part."   7 C.F.R. § 735.3.   A "non-storage agricultural product," or flow through product, is one "received temporarily into a warehouse for conditioning, transferring or assembling for shipment, or lots of an

---

[15] See, *supra*, pp. 24–29.

agricultural product moving through a warehouse for current merchandising or milling use, against which no warehouse receipts are issued and no storage charges assessed.  Id.

The peanuts in this case were stored at Defendant's warehouse for multiple months, and at least some of them remain in Defendant's possession today.  Clearly, the peanuts were "stored" within the meaning of the statute. Plaintiff argues that it is the parties' intent, rather than what actually occurred, that determines whether the products qualify as "stored" or "non-storage," citing In re Julien Co.  The cotton at issue in In re Julien Co., however, was intended to be shipped to its ultimate purchaser within hours or days of its arrival, and therefore did not constitute a "stored" product.  In this case, the peanuts were always intended to be stored in Defendant's warehouse until they could be sold, which Defendant estimated would take place over a period of six months.  Under the circumstances, the Court concludes that the peanuts are "stored agricultural products" under the Act, and are therefore subject to fees promulgated pursuant to the Act, assuming the prerequisites to charging such fees are met.

With respect to those prerequisites, Plaintiff need only show the absence of evidence to support Defendant's tariff counterclaim because Plaintiff bears the burden on this claim at trial.  Once Plaintiff's burden has been met, Defendant must point to a genuine dispute regarding an issue of material fact for which it bears the burden at trial.  As discussed in the subsection immediately preceding, the Court concludes that there is sufficient evidence to support Defendant's

counterclaim for the tariff; however, questions of material fact remain with respect to whether Plaintiff received notice sufficient to bind it to pay the tariff.  These questions are for the jury, not the Court, to determine.  Plaintiff's motion is **DENIED** with respect to Defendant's counterclaim for the tariff.

### 2.    Defendant's Counterclaim for Article 7 Lien (Count Two)

Plaintiff moves for summary judgment on Defendant's counterclaim for an "Article 7 Lien."  Defendant alleges that it has a lien on the peanuts "for charges for storage or transportation, including demurrage and terminal charges, insurance, labor, or other charges, present or future, in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale," pursuant to O.C.G.A. § 11-7-209.  Defendant claims a lien in the amount of $2,272,422.70—the same as its tariff claim.  The relevant portion of the statute provides:

> A warehouse has a lien against the bailor on the goods covered by a warehouse receipt or storage agreement or on the proceeds thereof in its possession for charges for storage or transportation, including demurrage and terminal charges, insurance, labor, or other charges, present or future, in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law.  If the person on whose account the goods are held is liable for similar charges or expenses in relation to other goods whenever deposited and it is stated in the warehouse receipt or storage agreement that a lien is claimed for charges and expenses in relation to other goods, the warehouse also has a lien against the goods covered by the warehouse receipt or storage agreement or on the proceeds thereof in its possession for those charges and expenses, whether or not the other goods have been delivered by the warehouse.  However, as against a person to which a negotiable warehouse receipt is duly negotiated, a warehouse's lien is limited to charges in an amount or at a rate specified in the

> warehouse receipt or, if no charges are so specified, to a reasonable charge for storage of the specific goods covered by the receipt subsequent to the date of the receipt.

O.C.G.A. § 11-7-209(a).  The statute also provides that "[a] warehouse loses its lien on any goods that it voluntarily delivers or unjustifiably refuses to deliver." Id. at § 11-7-209(e).

In its motion for summary judgment, Plaintiff argues that this Article 7 lien is unavailable to Defendant because Defendant (1) has voluntarily delivered 9,205 tons of farmers' stock peanuts to Plaintiff, (2) sold a portion of the remaining 2,264 tons of farmers' stock to third parties, and (3) "unjustifiably refused to deliver" any peanuts still in Defendant's possession, despite Plaintiff's "repeated requests."  (Doc. 36-2, p. 17).  In its response, Defendant does not appear to contest Plaintiff's argument that 9,205 tons of the peanuts were "voluntarily delivered" to Plaintiff.  The Court agrees, and Plaintiff is entitled to summary judgment in its favor on Defendant's counterclaim for the Article 7 lien for the 9,205 tons of peanuts that were delivered to Plaintiff.  With respect to the peanuts that Defendant has sold to third parties and the peanuts that remain in Defendant's possession, Defendant argues that it was entitled to refuse to deliver these peanuts to Plaintiff because ownership of this portion of the peanuts was and is unclear.   Whether or not the refusal was "unjustified" under the circumstances is a question of fact for the jury to decide.  Accordingly, Plaintiff's motion for summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART** with respect to Defendant's counterclaim for the Article 7 lien.  Plaintiff is entitled

to summary judgment with respect to the 9,205 tons of farmers' stock peanuts that were voluntarily delivered to Plaintiff by Defendant.  Plaintiff is not entitled to summary judgment for the 2,264 tons of farmers' stock that Defendant sold to third parties or continues to possess.

### 3.   Defendant's Counterclaim for Bailee Lien (Count Three)

Defendant has also counterclaimed for a lien pursuant to O.C.G.A. § 44-14-409 in the amount of $2,272,422.70 for "labor and services upon the things bailed."   Plaintiff moves for summary judgment on Defendant's counterclaim. The statute provides:

> The bailee for hire of labor and service shall have a special lien for his labor and services upon the things bailed until he parts with possession; and, if he delivers up a part of the thing bailed, the lien shall attach to the remainder in his possession for the entire claim under the same contract.

O.C.G.A. § 44-14-409.   Similar to its argument with respect to Defendant's counterclaim for the Article 7 lien, Plaintiff avers that Defendant has parted with possession of at least the 9,205 tons that were delivered to Plaintiff and that, accordingly, Plaintiff is entitled to summary judgment in its favor with respect to this portion of the peanuts *at a minimum*.  Plaintiff further argues that the lien only applies to "the things bailed," which in this case were farmers' stock peanuts. (Doc. 1-3).  Kenny Brownlee testified that the peanuts remaining in Defendant's possession have been shelled and are thus no longer "farmers' stock peanuts." (Doc. 36-3, p. 31). Without any farmers' stock peanuts remaining, Plaintiff contends that there can be no special lien under O.C.G.A. § 44-14-409.

33

Plaintiff's motion for summary judgment on the bailee lien is **GRANTED-IN-PART** and **DENIED-IN-PART**.  Plaintiff is entitled to summary judgment with respect to the 9,205 tons of farmers' stock peanuts that were delivered to Plaintiff by Defendant and with respect to any additional peanuts that were released to third parties.  However, whether Defendant's lien attaches to the remainder of the peanuts still in its possession for the entire claim, and whether the changed condition of the peanuts—from farmers' stock to shelled—waives any lien that may have existed under the statute are questions of fact that must be submitted to the jury.

### 4.    Defendant's Counterclaim for Breach of Contract (Count Four)

Plaintiff moves for summary judgment on Defendant's breach of contract counterclaim.  Defendant argues that Plaintiff is liable to it for "all fees and expenses related to Bailee's possession of the Peanuts," pursuant to subsection (7) of the Security Agreement.  Subsection (7) provides:

> The Company agrees that the Bailee will have no liability to the Company if it complies with the Secured Party's written directions as described herein.  The Company further agrees that it will continue to pay all fees and expenses related to Bailee's possession of the Peanuts and will reimburse Bailee for all reasonable costs and expenses incurred as a direct result of Bailee's compliance with the items and provisions of this letter.

(Doc. 1-4, p. 2).

Plaintiff first argues that Defendant cannot proceed on its breach of contract claim because Defendant has not conceded that the Security Agreement

34

is valid and enforceable.[16]  Plaintiff cites no law in support of this argument. Defendant's breach of contract claim is pled in the alternative, and Rule 8 of the Federal Rules of Civil Procedure allows a party to plead alternative and inconsistent claims and theories of recovery.  Fed. R. Civ. P. 8(e)(2).  Defendant need not concede that the security agreement is a valid and enforceable contract in order to survive summary judgment on its breach of contract claim.

Plaintiff next argues that Defendant cannot satisfy the elements of a breach of contract claim.  To state a claim for breach of contract in Georgia, a party must show, "1) breach and the 2) resultant damages 3) to the party who has the right to complain about the contract being broken."  Norton v. Budget Rent A Car System, Inc., 307 Ga. App. 501, 502 (2010).  Plaintiff argues that Defendant does not have a right to complain about the contract being broken because Defendant failed to comply with other provisions of the Security Agreement.  Defendant is only entitled to fees and expenses "incurred as a direct result of [Defendant's] compliance with the items and provisions of this letter." (Doc. 1-4, p. 2), and Plaintiff argues that Defendant failed to comply with subsections 3(ii), (5), and (6).

Subsections 3(ii) and (6) deal specifically with Defendant's possessory rights over the peanuts.  Subsection 3(ii) provides: "Bailee further acknowledges

---

[16] Plaintiff has not challenged the Security Agreement as either invalid or unenforceable.  Thus, the Court has not considered whether the Security Agreement is an enforceable contract.

that . . . it disclaims any and all ownership rights and interests in the Peanuts, and legal and beneficial title thereto remains and will continue to remain in the Company." (Doc. 1-4, p. 1). Subsection (6) requires that Defendant, "upon the oral or written direction of [BACB], deliver the Peanuts to such persons as [BACB] may instruct." (Doc. 1-4, p. 2). It is clear to the Court that Defendant failed to disclaim any and all ownership rights over the Peanuts and failed to deliver the Peanuts upon BACB's demand.

Defendant argues that it had a right to assert possessory liens on the peanuts which warranted maintaining possession over a portion of the peanuts, despite the clear terms of the Security Agreement. The Court disagrees. In subsection 3(v), the Security Agreement provides:

> [BACB's] security interest in the Peanuts is superior to all other liens, rights, claims and interests which Bailee may assert, including, without limitation, any lien, right, claim, right of offset or interest. For so long as this letter agreement is in effect, [Defendant] shall not foreclose or otherwise realize upon any security interest in, lien upon or claim to any of the Peanuts.

Assuming, *arguendo*, that the Security Agreement is a valid and enforceable contract and that Defendant had the right to assert possessory liens on the peanuts, asserting such liens is a direct violation of subsections 3(ii), 3(v), and (6) of the Security Agreement. Because the recovery of fees and expenses related to Defendant's possession of the peanuts depends on Defendant's compliance with all portions of the Security Agreement, these violations are fatal to Defendant's breach of contract claim, and Plaintiff is entitled to summary

judgment.  The Court need not address Defendant's alleged non-compliance with subsection (5). [17]   Plaintiff's motion for summary judgment is **GRANTED** on Defendant's counterclaim for breach of contract.

### 5.   Defendant's Counterclaim for Promissory Estoppel on Alleged Agreement (Count Five)

Plaintiff moves for summary judgment in its favor on Defendant's counterclaim for promissory estoppel on the alleged Agreement.  Defendant argues that Plaintiff should be estopped from demanding that Defendant turn over additional peanuts because the parties allegedly agreed on June 4, 2014 for Plaintiff "to be paid by Defendant's delivery and transfer of certain farmers' stock peanuts."  (Doc. 6, ¶¶ 89, 101).  Defendant contends that, in reliance on Plaintiff's promise to credit Defendant on the debt owed, Defendant released sufficient tonnage of peanuts to pay the debt.

As discussed *supra*, page 10, Defendant must establish the following elements in order to succeed on a promissory estoppel claim: (1) that Plaintiff made certain promises, (2) that Plaintiff should have expected that Defendant would rely on such promises, and (3) that Defendant did in fact rely on such promises to its detriment.  Adkins, 411 F.3d at 1326 (11th Cir. 2005).  In its motion for summary judgment, Plaintiff argues that Defendant has not presented

---

[17] Subsection (5) reads: "[Defendant] agrees to give [BACB] notice if [Plaintiff] is more than sixty days in arrears on any charges payable to [Defendant] or if [Plaintiff] defaults on its obligations to [Defendant].  In such an event of default, [Defendant] will allow [BACB] the option to cure, or cause [Plaintiff] to cure, such default within fifteen days of notice.  (Doc. 1-4, p. 2).

evidence that Plaintiff made the alleged promise or that Defendant relied on the alleged promise to its detriment.

A review of the record convinces the Court that material questions of fact remain unanswered with respect to Defendant's promissory estoppel counterclaim.   The evidence appears to establish that Defendant agreed to release peanuts to Plaintiff in exchange for at least some credit on the debt owed.   (Doc. 36-3, p. 20).   However, Defendant has presented sufficient evidence to show a dispute as to whether the parties agreed that the 9,205 tons of peanuts released would cover the entire debt, or whether this tonnage would only satisfy a portion of the money owed.  This question must be resolved by the jury; thus, Plaintiff's motion for summary judgment on Defendant's counterclaim for promissory estoppel is **DENIED**.

### 6.     Defendant's Counterclaim for Fraud (Count Six)

Defendant seeks damages from Plaintiff based on Plaintiff's alleged representation that it "would extend and renew the alleged contract beyond February, 2014, without consideration."   (Doc. 6, ¶ 105).   The purported representation is based on the following pieces of evidence:

(1)     Defendant's Affidavit, which states that "[Plaintiff], through its legal counsel, drafted documents entitled sales contract and purchase contract dated August 20, 2013.   [Plaintiff] represented to [Defendant] that the documents would never been [*sic*] seen by anyone, nor would they be binding.   [Defendant] viewed the transaction as a loan."   (Doc. 35-1, ¶ 5).

Based on this sworn testimony, Defendant extrapolates in its response to Plaintiff's motion for summary judgment that "Tom Snoek acknowledged to the Brownlees that it was impossible to sell and shell 11,648 tons of peanuts within six (6) months." (Doc. 40, p. 15). No such representation is alleged Banner Grain's Affidavit.

(2)   Tom Snoek's communication with Kenny Brownlee, asking if Defendant could arrange for at least "some movement" so that Mr. Snoek could "keep the bank at bay because the bank was putting a lot of pressure on [Snoek] because [Brownlee] previously promised to sell the peanuts by Christmas and [Plaintiff] gave him two months grace." (Doc. 35-2, p. 208).

(3)   An email from Nicholas Funnell, an employee of Plaintiff, to Kenny Brownlee, explaining that, because the original pricing mechanism expired at the end of February 2014, the contract needed to be amended to reflect a new, higher cost for paying back the debt. (Doc. 35-2, p. 410).

(4)   Tom Snoek's deposition testimony, in which he acknowledged that the Parties agreed that Plaintiff would take possession of the peanuts and sell them to mitigate their losses. (Doc. 35-2, pp. 143–44).

The tort of fraud consists of five elements: (1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages." Argentum Int'l, LLC v. Woods, 634 S.E.2d 195, 200 (Ga. Ct. App. 2006) (internal quotation marks omitted). Plaintiff argues that it is entitled to summary judgment

because Defendant has failed to present evidence that Plaintiff made a false representation, that such representation was made with scienter or an intent to induce Defendant to act, or that Defendant justifiably relied on such representation. The Court agrees with Plaintiff that the evidence described in (1), (2), and (3) above fails to create an issue of fact as to Defendant's fraud claim. There is no evidence that any representations made in these instances were false, or that these representations caused Defendant to rely to its detriment.

The representation discussed in (4) presents a material dispute of fact that must be decided by a jury. As the Court has already discussed, *supra* page 38, sufficient evidence has been presented to create a question for the jury as to whether the 9,205 tons of released peanuts would cover the entire debt owed by Defendant, or whether Defendant needed to turn over all 11,648 tons to fully satisfy the debt. Defendant has produced evidence from which a jury could conclude that Plaintiff falsely represented that the 9,205 tons would suffice, that Plaintiff made this representation knowing that it was not true and intending to induce Defendant to turn over possession of the peanuts, and that Defendant relied to its detriment by releasing peanuts on which it may have had an enforceable lien.[18] Accordingly, Plaintiff's motion for summary judgment is **DENIED** with respect to Defendant's counterclaim for fraud.

---

[18] See, *supra*, pp. 31–34 for a discussion of Defendant's potential lien claims.

### 7.    Defendant's Counterclaim for Promissory Estoppel on Alleged Representation (Count Seven)

Plaintiff moves for summary judgment on Defendant's counterclaim for promissory estoppel on the alleged "Representation" that "Plaintiff would extend and renew the alleged contract beyond February, 2014, without consideration." (Doc. 6, ¶¶ 105, 114–19).  Defendant has failed to produce evidence to create a question of fact as to whether Plaintiff agreed to renew the alleged contract beyond February of 2014.[19]  The only representation about which a material dispute of fact exists concerns Plaintiff's agreement to credit the debt owed by Defendant, if Defendant released an amount of peanuts to Plaintiff.  Defendant has already asserted a promissory estoppel claim on this alleged agreement.[20]  Accordingly, Plaintiff's motion for summary judgment on Defendant's counterclaim for promissory estoppel on the alleged Representation is **GRANTED**.

### 8.    Defendant's Counterclaims for Punitive Damages (Count Eight) and Bad Faith (Counts Eight and Nine)

Count Eight of Defendant's Answer and Counterclaim alleges that Plaintiff's actions "demonstrate the intentional or willful misconduct and the entire want of care or indifference to consequences, so as to justify an award of punitive damages."  (Doc. 6, ¶ 121).  Plaintiff moves for summary judgment on Defendant's claim for punitive damages, arguing that "there is no evidence of

---

[19] See, *supra*, pp. 38–40.
[20] *Supra*, pp. 37–38.

'willful misconduct, malice, fraud, wantonness . . . oppression, or . . . conscious indifference to consequences,' which is necessary to authorize the imposition of punitive damages."  (Doc. 36-2, p. 27 (citing Carter v. Allstate Ins. Co., 399 S.E.2d 500, 504 (Ga. Ct. App. 1990)).  The Court has concluded that sufficient evidence has been presented to create a dispute of fact with respect to Defendant's fraud claim.[21]  Because sufficient evidence of fraud on the part of Plaintiff has been presented, Plaintiff is not entitled to summary judgment in its favor on Defendant's punitive damages claim. Plaintiff's motion for summary judgment on Defendant's punitive damages claim is **DENIED**.

Count Nine claims that "[t]he actions of Plaintiff have been made in bad faith and have caused unnecessary trouble and expense so as to justify an award of Defendants' attorney' [*sic*] fees and expenses of litigation pursuant to O.C.G.A. § 13-6-11."  (Doc. 6, ¶ 124).  Plaintiff avers that because "the record is clear there is a bona fide dispute between the parties," summary judgment must be granted in its favor on Defendant's counterclaim for bad faith.  (Doc. 36-2, p. 27).  However, the existence of a bona fide dispute between the parties is not determinative, and summary judgment should only be granted on a party's bad faith claim in "the rare case where there [is] absolutely no evidence to support the award of expenses of litigation."  American Medical Transport Group, Inc. v. Glo-An, Inc., 509 S.E.2d 738, 741 (Ga. Ct. App. 1998).  An allegation of fraud may

---

[21] See, *supra*, pp. 38–40.

constitute "bad faith" within the meaning of the statute, and as previously stated, Defendant has presented evidence sufficient to create an issue of fact on its fraud claim.  Perry & Co., et al. v. New South Ins. Brokers of Georgia, Inc. et al., 354 S.E.2d 852, 856 (Ga. Ct. App. 1987).  This action does not fall within the category of "rare" cases where summary judgment is appropriate on a bad faith claim, and Plaintiff's motion for summary judgment on Defendant's bad faith claim is **DENIED**.

### 9.    Plaintiff's Claim for Breach of Contract (Count One)

Plaintiff moves for summary judgment on its breach of contract claim.  A valid contract has four elements: parties able to contract, consideration, mutual assent to the terms of the contract (i.e., a meeting of the minds), and subject matter upon which the contract can operate.  See O.C.G.A. § 13-3-1.  Defendant appears to dispute that the parties mutually assented to the terms of the contract.

Under Georgia law, the mutual assent of the parties is essential to the formation of a contract.  See O.C.G.A. § 13-3-2 ("The consent of the parties being essential to a contract, until each has assented to all the terms, there is no binding contract; until assented to, each party may withdraw his bid or proposition.").  "Thus, where parties have intended to enter into an agreement and expressed their mutual intentions to be bound, a valid contract has been formed." Everidge v. Wells Fargo Bank, No. 5:12-CV-497, 2015 WL 5786738, at *14 (M.D. Ga. Sept. 29, 2015) (internal quotation marks omitted).  However, "[a]cceptance of an offer must be unconditional, unequivocal, and without

variance of any sort; otherwise, there can be no meeting of the minds and mutual assent necessary to contract formation."   Durham v. McLaughlin, 648 S.E.2d 495, 496 (Ga. Ct. App. 2007) (citation omitted).

> In determining whether there was a mutual assent, courts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable man in the position of the other contracting party would ascribe to the first party's manifestations of assent, or that meaning which the other contracting party knew the first party ascribed to his manifestations of assent.  Further, in cases such as this one, the circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement.  Where such extrinsic evidence exists and is disputed, the question of whether a party has assented to the contract is generally a matter for the jury.

Turner Broadcasting System, Inc. v. McDavid, 693 S.E.2d 873, 878 (Ga. Ct. App. 2010) (citations omitted).

In response to Plaintiff's argument in favor of summary judgment on its breach of contract claim, Defendant contends that there was no mutual assent to the Sales Contract.  First, Defendant points out that both parties understood the transaction to be a loan rather than an agreement, pursuant to which Plaintiff would purchase peanuts and resell them to Defendant.   (Doc. 35-1, ¶ 5). Second, Defendant argues that the contract was never intended to be binding and was only "to make the banker and US lawyer more comfortable."  (Doc. 35-1, ¶ 5; Doc. 36-3, p. 51)

It is undisputed that both parties signed the Sales Contract on August 20, 2013.   (Doc. 36-3, p. 40).  At the time of signing, Plaintiff had already paid Defendant for the title to a sum of farmers' stock peanuts, as reflected in the

Purchase Contract.  (Doc. 36-3, p. 51; Doc. 36-3, p. 39).  The Sales Contract provided a sliding payment scale by which Defendant could repurchase the peanuts from Plaintiff.  (Doc. 36-3, p. 40).  A review of the depositions and other discovery materials submitted on this point convinces the Court that the transaction was understood to be a loan, as Defendant contends.  However, this fact is not disputed and does not create an issue of fact as to whether there was mutual assent to the terms of the Sales Contract.  (See Doc. 36-5, pp. 2, 6).

The Parties do disagree on whether the Sales Contract was intended to be binding.  (Doc. 35-1, ¶ 5).  In support of its argument that the contract was not intended to be binding, Defendant cites two pieces of evidence: (1) Tom Snoek's deposition transcript (Doc. 35-2) and (2) Defendant's affidavit (Doc. 35-1).  The cited portion of Tom Snoek's deposition testimony reads:

> Q: Banner Grain did not prepare any of the purchase and sale contracts, did it?
> A: They did not.
> Q: They did not suggest the structure, did they?
> A: They did not, but they signed the documents.
> Q: That you asked them to sign?
> A: That Jones Day suggested I should give to them to sign to secure my position given that I was parting with a very large sum of money.

(Doc. 35-2, p. 216).  Nothing in this exchange provides support for Defendant's argument that it was induced to enter into the Agreement because it believed the Agreement would not be binding.  In fact, Mr. Snoek's statement that the Agreement was intended to "secure [his] position given that [he] was parting with

a large sum of money," supports the opposite conclusion—that *of course* the Agreement was understood to be binding.

The other piece of evidence cited to support Defendant's argument is its Affidavit, which states:

> [Plaintiff], through its legal counsel, drafted documents entitled sales contract and purchase contract dated August 20, 2013.  [Plaintiff] represented to [Defendant] that the documents would never been [*sic*] seen by anyone, nor would they be binding.  [Defendant] viewed the transaction as a loan.

(Doc. 35-1, ¶ 5).  A representation in an affidavit, alone, can create a question of fact sufficient to survive summary judgment, when the representation is not explicitly contradicted by other testimony in the record.  See Akins v. Fulton County, Ga., 278 Fed. Appx. 964, 968 (11th Cir. 2008) (sham affidavit rule, which allows the court to disregard an affidavit, only applies when the affidavit "flatly contradicts earlier deposition testimony in a manner that cannot be explained"); see also Wright v. Langford, No. 5:10-CV-272, 2011 WL 4543880 (M.D. Ga. Sept. 30, 2011) (concluding that an affidavit, in and of itself, was sufficient to create a genuine issue of material fact).

None of the evidence filed with the Court "flatly contradicts" Defendant's assertion that Plaintiff represented that the contract would be non-binding. Further, this statement, if believed, creates a genuine issue of material fact as to whether the parties mutually assented to the terms of the Agreement.  Credibility determinations are for the jury, not the Court.  Anderson, 477 U.S. at 255. Defendant has produced evidence demonstrating the existence of a triable issue

of fact on the existence of a contract.  Accordingly, Plaintiff's motion for summary judgment is **DENIED** as to its breach of contract claim.

### 10.  Plaintiff's Claim for Conversion (Count Five)

Count Five of Plaintiff's Complaint alleges that Defendant is liable for conversion as a result of Defendant's possession of peanuts owned by Plaintiff, which Plaintiff has demanded that Defendant release to Plaintiff, and which Defendant has refused to deliver.  (Doc. 4, ¶¶ 47–52).  Plaintiff alleges that Defendant "intentionally caused a serious and substantial interference with [Plaintiff's] ownership of its peanuts" by not complying with the terms of the Sales Contract, and by retaining physical possession of the peanuts owned by Plaintiff after demands to release the peanuts.  (Doc. 4, ¶ 50).  A conversion claim requires proof of the following elements: (1) Plaintiff has the title or right of possession to the property in question, (2) Defendant has actual possession of the property, (3) Plaintiff demanded for the property to be returned, and (4) Defendant refused to return the property.  Club Car. Inc. v. Clue Car (Quebec) Import, Inc., 276 F.Supp.2d 1276, 1295 (S.D. Ga. 2003).

Here, material questions of fact remain in dispute as to whether Plaintiff has the title or right of possession of the peanuts in question.  Defendant alleges that it has a lien on the peanuts that remain in its possession.  The Court has concluded that Plaintiff is not entitled to summary judgment on Defendant's lien claims, with respect to the remaining peanuts.  As a result, Plaintiff's right to title

or possession is not clear as a matter of law, and Plaintiff's motion for summary judgment on its conversation claim must be **DENIED**.

           11.    Plaintiff's Claim for Negligent Misrepresentation

The Court previously concluded that Defendant is entitled to summary judgment in its favor on Plaintiff's negligent misrepresentation claim. [22] Accordingly, Plaintiff's motion for summary judgment on its negligent misrepresentation claim is **DENIED**.

## IV.   CONCLUSION

For the reasons stated above, Plaintiff's Partial Motion for Summary Judgment (Doc. 36) is **GRANTED-IN-PART** and **DENIED-IN-PART**. Defendant's Partial Motion for Summary Judgment (Doc. 35) is **GRANTED-IN-PART** and **DENIED-IN-PART**.


**SO ORDERED**, this the 30th day of September, 2016.

                       */s/ Hugh Lawson*

                       **HUGH LAWSON, SENIOR JUDGE**

les

---

[22] See, *supra*, pp. 20–23.